**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.** **Case No. 07-20151-JWL**

**MICHAEL WATTREE,**

**Defendant.**

## MEMORANDUM & ORDER

Defendant Michael Wattree was charged by indictment (doc. #1) with two counts on October 23, 2007. The first count alleges that he was a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Count 2 alleges that Mr. Wattree was an unlawful user of a controlled substance in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). There are currently three motions by Mr. Wattree pending before the court: Motion to Dismiss Count 1 (doc. # 15), Motion to Suppress (doc. #16), and Motion to Determine Admissibility of Custodial Statements (doc. # 17). The Court held a hearing on February 26, 2008, and the parties have filed supplemental briefing on the Motion to Dismiss. The Motion to Dismiss is granted in part as to the aggravated escape conviction but denied in part as to the burglary conviction. The Motion to Suppress is denied. Last, the Court finds that the custodial statements by Mr. Wattree are admissible.

**FINDINGS OF FACT**

Kansas City, Kansas police officers received a complaint that a black male was selling narcotics to local high school students out of a residence. On October 20, 2007, Heather Shondell, later identified as Mr. Wattree's wife or Ms. Wattree, was stopped for a traffic violation near that residence. She was cited for driving on a suspended license and for an outstanding misdemeanor warrant in Kansas City, Kansas. She was issued a failure to appear summons and released. The other individual in the car was Ms. Thibodeau, who was arrested for possession of drug paraphernalia. She told the officers that she believed Mr. Wattree was selling drugs out of the house. Sergeant Hallmark, who took the information, ran Mr. Wattree's name and found that he had several outstanding warrants.

Officer Bundy was a uniformed officer of the Kansas City Kansas Police Department Community Oriented Policing Problem Solving Unit, otherwise known as the nighttime community policing unit. On October 21, 2007, he was notified of the complaint and the traffic stop that took place the prior day. That afternoon, officers set up to watch the traffic to and from the house. They did not see an unusual amount of traffic, but around 5:00pm, the officers saw Mr. and Ms. Wattree leave the residence in the same vehicle in which Ms. Wattree was pulled over the previous day. Sergeant Hallmark pulled them over a few blocks from the residence based on the knowledge that Mr. Wattree had outstanding warrants. Mr. Wattree was handcuffed and taken to Officers Bundy and Erwin's vehicle. Officers Bundy and Erwin had followed Sargeant Hallmark in a separate police car.

Officer Bundy stood outside the vehicles to watch the passenger, Ms. Wattree, and saw what he believed to be a small bag of marijuana go out the passenger's side window. Officer

Bundy picked up the bag and had Ms. Wattree and her infant child get into Sergeant Hallmark's car, which was an uncaged vehicle. Without handcuffing Ms. Wattree, Officer Bundy told her they were going to issue her a misdemeanor summons for the possession of marijuana. Officer Erwin issued her the ticket shortly after the initial stop of the vehicle and both officers signed it. When the officers gave her the summons, they told Ms. Wattree that she was free to go.

Officer Bundy testified that Ms. Wattree was aware that this summons was being issued in lieu of taking her to jail. Issuing a summons is the usual procedure for a misdemeanor when a child is present, so the child does not have to go into state custody. Officer Bundy, however, never verbalized to Ms. Wattree or any other officer this concern about her child going into custody. The words, "protective custody," were never stated to Ms. Wattree or another officer because the officers already knew that was the standard procedure.

After the summons was issued, Officer Bundy spoke to Ms. Wattree about the complaints they had received about the sale of marijuana from the house. She admitted there was a small bag of marijuana in the house but stated that Mr. Wattree did not sell drugs. The officer inferred that she was alluding to personal drug use when she mentioned the small bag. When asking her these questions, the officer's intent was to see if she was going to give consent to search the house. In light of the possible search of the house and officer safety concerns, the officer asked Ms. Wattree whether there were any guns in the home. Ms. Wattree told the officers there was a gun at the residence, which Mr. Wattree purchased for home protection. When asked if she or Mr. Wattree had any felony convictions, she said that she did not, but that Mr. Wattree had been convicted of a felony but did not know the details.

Officer Bundy testified that it was his understanding of the law that no convicted felon can ever possess a gun. He also testified that he knew it was unlawful for people who use marijuana to possess a gun. He never specifically stated on what basis he seized the firearm.[1]

Officer Bundy read and explained a consent-to-search form to Ms. Wattree and informed her that she had the right to refuse consent. The form stated that she freely and voluntarily gave her consent to search her residence and authorized the officers to remove any evidence of any violation of the law. Ms. Wattree, then outside the police vehicle, signed the form.

While Officer Bundy was speaking to Ms. Wattree, Officer Erwin spoke to Mr. Wattree in Officer Erwin's police vehicle. Mr. Wattree started out being uncooperative, but once he was placed in the vehicle he became cooperative and then eventually started crying. The officer asked him, "What is wrong?," to check his general welfare. Mr. Wattree replied that he was a convicted felon and he had a new baby, so he did not want to go back to jail. Mr. Wattree did not provide any details about his prior conviction. He was transported to Wyandotte County Jail.

Sergeant Hallmark ran a check on Mr. Wattree through a dispatcher using the Alert system, and the "J codes," which represent charges against a person, came back for assault, burglary, theft, and narcotics. Officer Bundy, who heard the radio communications, testified that based on his training and experience when someone has as many J codes as Mr. Wattree, there is usually a conviction on at least one. Officer Erwin also shared with Officer Bundy that Mr. Wattree stated he was a convicted felon.

---

[1] In Mr. Wattree's Supplement to Motion to Suppress, he states, "This motion hearing illuminated the reason *why Officer Bundy seized the weapon* in question – he was mistaken about the law governing firearm possession by a convicted felon in Kansas." (doc. # 24 at 1) (emphasis added). Officer Bundy, however, never stated the reason on which he based the seizure of the gun.

The officers took Ms. Wattree back to the house, where she let the officers enter. She directed the officers to the basement where she and Mr. Wattree lived and also pointed out the dresser drawer where the firearm, a magazine, and a holster were located. The officers recovered all three items. During the search, the officers also seized a small bag of marijuana and drug paraphernalia and testified that was indicative of personal drug use. All the items were seized from one open room in the basement where the Wattrees were living. Ms. Wattree was cordial and even friendly with the officers throughout the search. She never told the officers to stop the search.

Sergeant Hallmark contacted Detective Sutton, who is assigned to the ATF Task Force, between 6:15pm and 6:30pm on that Sunday evening. Detective Sutton gives his number to officers in order to assist them in determining whether a person is a convicted felon and if they are in violation of any gun laws. Detective Sutton understood that they called him because the officers believed that Mr. Wattree had a prior felony conviction.

Detective Sutton arrived after the search of the home and the seizure of the gun, so any information he obtained was after the challenged gun seizure. Most of the officers were outside the house. He spoke to Sergeant Hallmark. Detective Sutton first said he could not recall whether Sergeant Hallmark told him anything about Michael Wattree's marijuana use at the time the detective arrived at the scene. He added that the big issue was his convicted felon status, so the marijuana was a side note. Detective Sutton then explained that Sergeant Hallmark told him that they knew Mr. Wattree was a convicted felon from information obtained on the scene, that the officers had recovered marijuana from the house, and that Michael Wattree was alleged to have been selling marijuana from the house.

Ms. Wattree was inside the home. She said that she was willing to talk to Detective Sutton and was cooperative. She informed him that Mr. Wattree smoked marijuana daily to control his bipolar issues, that she and Mr. Wattree lived at the residence, that Mr. Wattree was a convicted felon, and that Mr. Wattree bought the firearm sometime in January 2007 when the couple lived in Missouri.

After leaving the scene, Detective Sutton usually verifies the convicted felon status through a certified journal entry of judgment, but could not go to a courthouse on that night since it was Sunday. He instead pulled up the convictions on the Kansas Department of Corrections Website, which shows how long ago a conviction occurred, when the sentence expired, and what the underlying offense was. He saw that Mr. Wattree had an expired sentence as of October 9, 2002. He later obtained the court documents related to the sentence, which indicated convictions for burglary and aggravated escape from custody.

Based upon the information from the KDOC website, the detective went to speak with Mr. Wattree at the jail on that Sunday night. He told Mr. Wattree that he was there to investigate the complaint of him having a gun at the residence and the drugs involved. He advised him of his rights with the assistance of an advice of rights form. He drew a line by each right listed after he read it to Mr. Wattree and asked him if he understood. Detective Sutton never stated at the hearing whether Mr. Wattree actually stated that he did or did not understand, but there were lines marked next to each paragraph. He stated that he used the lines to keep track of which ones he did not need to go over again. Detective Sutton also discussed with Mr. Wattree his education to make sure he understood the rights read to him. Mr. Wattree indicated that he graduated from high school and was currently attending community college classes. He

also stated he was smarter than the average guy. Mr. Wattree then read the waiver of rights paragraph to Detective Sutton, but then he declined to sign the form. Mr. Wattree, however, orally indicated he was willing to speak to the detective. He spoke briefly, indicating he used drugs twice a day and that he had bought the gun in January 2007, confirming what Ms. Wattree had already said. The officer did not include anything about the gun in the report of the conversation, but said that he included that information in his notes taken at the time he was talking to Mr. Wattree and also in his testimony to the grand jury just a few days after the interview. Mr. Wattree eventually decided he did not want to talk anymore, and Detective Sutton ended the contact at that point.

## MOTION TO SUPPRESS

Mr. Wattree alleges both that Ms. Wattree's consent to search the residence was involuntary and that there was no probable cause to seize the gun once the officers were inside the residence. Each is discussed in turn.

### 1. Consent to search the residence

The Fourth Amendment generally prohibits the government from making a warrantless entry into a person's residence to search for specific objects. *Illinois v. Rodriquez*, 497 U.S. 177, 181 (1990). It is well settled, however, that voluntary consent can obviate the warrant requirement of the Fourth Amendment. *United States v. Brooks*, 427 F.3d 1246, 1249 (10th Cir. 2005). Consequently, "[c]onsent can justify an entry into a home, regardless of whether there is probable cause." *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006). Two requirements must be satisfied: (1) the consent must have been voluntary, and (2) the search must not have exceeded the scope of the consent. *United States v. Sims*, 428 F.3d 945, 952 (10th

Cir. 2005). The voluntariness of consent is a factual issue, determined from the totality of all the circumstances. *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). "For consent to be valid, two conditions must be met: (1) There must be a[sic] clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *Id.* (quotations omitted).

Here, the evidence establishes that Ms. Wattree had authority to consent to the search of the home and that her consent was unequivocal, specific, and freely given without duress or coercion. She and Mr. Wattree shared the living space in the basement of the house, which was the area searched, so she had authority to consent. The consent also was specific and unequivocal, as Ms. Wattree signed a consent to search form that specifically listed her rights and gave consent to search that particular residence.

As to the voluntariness of the consent, Mr. Wattree's Motion to Suppress alleges that Ms. Wattree only consented to the search after the officer told Ms. Wattree that he was going to arrest her and place her infant daughter in state protective custody. There was no evidence of such a statement during the hearing. In fact the officer testified that the words "protective custody" were never spoken. Issuing a summons in that situation was standard procedure, so it was unnecessary to discuss the reasoning. The officers did not threaten Ms. Wattree in any way, let alone by telling her they were going to put her daughter in state custody. Ms. Wattree's consent to search her home was voluntary.

**2. Seizure of the handgun**

"What constitutes a conviction of [a felony] shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been

expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of [section 922(g)], unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(20). Because Mr. Wattree's convictions were in Kansas, Kansas state law applies in determining whether his rights had been restored, whether he was permitted to have a gun in Kansas at the time he was arrested, and ultimately whether the underlying state conviction was a "conviction" within the meaning of section 922(g)(1). *See United States v. Hall*, 20 F.3d 1066, 1069 (10th Cir. 1994) ("To determine whether [the defendant] was lawfully charged with violating § 922(g)(1) we therefore must consider (1) whether [the state] had restored [the defendant]'s civil rights, and (2) whether [state] law prohibited [the defendant] from possessing a firearm at the time of his arrest.").

Mr. Wattree argues that the officers should not be permitted to rely on his status as a convicted felon for probable cause to seize the firearm because under Kansas law, not all convicted felons are prohibited from possessing firearms. The issue stems from the following factual situation. Mr. Wattree completed his sentence for his state felony convictions on October 9, 2002. Upon completion of a sentence, including probation, Kansas automatically restores a person's rights to vote, serve on a jury, and take public office. K.S.A. §§ 21-4615, 22-3722. One's right to possess a firearm, however, is limited for a period of time that depends on what crime was committed. K.S.A. § 21-4204. For Mr. Wattree's convictions, the time period was five years. K.S.A. § 21-4204(a)(3). As explained by Detective Sutton at the hearing, this means Mr. Wattree's rights were restored under state law and for purposes of section 922(g)(1) on October 9, 2007, a few weeks prior to the arrest. Therefore, Mr. Wattree claims that if

officers would have researched whether his rights had been restored, they would have found that on that day he was not prohibited from possessing a gun, and therefore, the officers had no probable cause to seize the gun.[2] *See* Supplement to Motion to Suppress ("But the officers enforcing Kansas law here lacked probable cause because they did not know (although they had the ability to quickly determine) the nature and timing of Mr. Wattree's prior felonies.").

The Supreme Court has set forth the probable cause standard that must be satisfied to avoid a violation of one's Fourth Amendment rights.

> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.

*Texas v. Brown*, 460 U.S. 730 (1983). Here, Ms. Wattree gave consent to a warrantless search. The gun was discovered during that warrantless search and was seized without a warrant.

> [A]n essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be "immediately apparent."

---

[2] The government acknowledges that "arguably, on October 21, 2007, [Mr.] Wattree's civil right to possess a firearm had been restored based upon his prior felony conviction." Count One of the Indictment charges Mr. Wattree on the basis that he acquired and possessed the gun prior to the restoration of his rights on October 9, 2002. This information, that Mr. Wattree acquired the gun in January 2007, was obtained by Detective Sutton *after* the gun was seized by other officers. *See United States v. Blom*, 242 F.3d 799 (8th Cir. 2001) (for information to provide basis for probable cause it must be known at the time the evidence is seized). Thus, Mr. Wattree challenges whether the officers who seized the gun had sufficient information at the time they seized it.

*Horton v. California*, 496 U.S. 128 (1990); *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999 (an officer can seize contraband without a warrant when . . . "the object's incriminating character was immediately apparent- i.e., the officer had probable cause to believe the object was contraband or evidence of a crime") (quoting *United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994)). Mr. Wattree essentially challenges the last requirement, whether the officers had probable cause that the gun was evidence of a crime when they did not first establish whether his prior felony conviction prohibited him from possessing a gun.

"Probable cause is measured against an objective standard. It is evaluated 'in relation to the circumstances as they would have appeared to prudent, cautious and trained police officers.' The 'subjective belief' of an individual officer as to whether there was probable cause for making an arrest is not dispositive." *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999) (citing and quoting *Florida v. Royer*, 460 U.S. 491, 507 (1983); *Beck v. Ohio*, 379 U.S. 89, 96 (1964); *United States v. McCormick*, 468 F.2d 68, 73 (10th Cir. 1972)). "We measure probable cause against an objective standard and evaluate it in relation to the circumstances as they would appear to a prudent, cautious and trained police officer. . . . That an officer did not believe probable cause existed to detain a suspect does not preclude the Government from justifying the suspect's detention by establishing probable cause." *United States v. Santana-Garcia*, 264 F.3d 1188, 1192 (10th Cir. 2001) (accepting government's argument that the "district court erroneously failed to consider other factors which were known to [the officer], but which he apparently did not rely on to detain [d]efendants" and rejecting the defendants' argument that "in evaluating the reasonableness of a detention, the law does not permit a court

to analyze factors which a law enforcement officer is aware of but does not expressly consider as a basis for detention").

Based on this standard, this Court finds it unnecessary to reach Mr. Wattree's main challenge concerning the issue of whether an officer, before seizing a firearm, must not only establish that a person is a convicted felon, but also that the convicted felon's rights have not been restored and is still prohibited from possessing the firearm. While the exact reasoning of why the officers seized the gun is unclear from the testimony at the hearing, their subjective reasoning is irrelevant to the probable cause analysis. The Court, instead, focuses on an objective evaluation of the facts and knowledge the officers had at the time the gun was seized. Here, officers had probable cause that the gun was contraband or evidence of a crime based upon facts other than Mr. Wattree's convicted felon status.

Regardless of the subjective basis on which Sergeant Hallmark, Officer Bundy, or Officer Erwin relied in seizing the gun, an objective evaluation shows that probable cause existed. The officers originally set up surveillance at the house based on a complaint about the sale of drugs. Ms. Thibodeau also told officers the night before the gun was seized that Mr. Wattree was distributing drugs. Ms. Wattree told the officers at the traffic stop in which Mr. Wattree was arrested that there was a small amount of marijuana in the house and that there was a gun there as well. When the officers arrived at the house, they did, in fact, find marijuana, drug paraphernalia, and a gun all in the same room. These facts establish the officers had probable cause to believe the gun was evidence of a crime, either that it was possessed in furtherance of the distribution of drugs in violation of 18 U.S.C. § 924(c) or that Mr. and/or Ms. Wattree, as (a) user(s) of narcotics was/were prohibited from possessing the gun under 18 U.S.C. § 922(g)(3).

There was, therefore, probable cause that the gun was evidence of a crime, and its incriminating character was immediately apparent. The Motion to Suppress is denied.

## MOTION TO DISMISS COUNT ONE

### 1. Legal Background

The former Kansas state sentencing scheme allowed a judge to depart from a presumptive sentence provided by the Kansas Sentencing guidelines if "the judge [found] substantial and compelling reasons." K.S.A. § 21-4716(a) (2000). The court had discretion to depart based on a number of aggravating factors listed in the same statute. § 21-4716(b)(2) (2000). The U.S. Supreme Court then decided *Apprendi v. New Jersey* on June 26, 2000, holding that any fact that increased a sentence beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. 530 U.S. 466, 490 (2000). In light of *Apprendi*, the Kansas Supreme Court held on May 25, 2001, that K.S.A. § 21-4716 was unconstitutional because it gave courts the discretion to increase a sentence "based upon a court finding of certain aggravating factors found by a preponderance of the evidence." *State v. Gould*, 271 Kan. 394, 412-13 (2001). The court held that its decision would be retroactive to the date of the *Apprendi* decision, June 26, 2000. *Id.* at 413.

On June 6, 2002, Kansas adopted a new sentencing scheme that comported with *Apprendi* and allowed for departures. Between June 26, 2000, and June 6, 2002, "upward departure sentences in Kansas were unconstitutional." *United States v. Hill*, 512 F.3d 1277, 1279 (10th Cir. Jan. 15, 2008). During this time, courts did not have the power to depart upward from the presumptive range. Under the new scheme implemented June 6, 2002, the court may

only depart if the fact finding comports with *Apprendi*. The Tenth Circuit has interpreted what this means in relevance to the sentencing guidelines and 18 U.S.C. § 922(g), which require that there be "a crime punishable by imprisonment for a term exceeding one year." In *Plakio* and *Hill*, the Tenth Circuit held that whether someone committed a crime under Kansas state law that is punishable in excess of one year depends on the *individual* defendant's maximum sentence, which is determined both by the severity of the crime committed *and* that individual defendant's criminal history—not the longest possible sentence for any hypothetical defendant. *United States v. Hill*, 512 F.3d 1277 (10th Cir. Jan. 15, 2008); *United States v. Plakio*, 433 F.3d 692 (10th Cir. 2005); *see also United States v. Thomas*, 171 Fed. Appx. 250, 2006 WL 679842 (10th Cir. 2006) (deciding case based upon *Plakio* holding and explaining that "[t]he issue of what constitutes 'a crime punishable by imprisonment for a term exceeding one year,' for purposes of § 922(g)(1), is governed by 'the law of the jurisdiction in which the proceedings were held.' 18 U.S.C. § 921(a)(20).").

**2. Analysis**

**a. Burglary Conviction**

Mr. Wattree was sentenced on the burglary conviction in Kansas state court on September 6, 2000, during the time when upward departures were unconstitutional. The court did not have the power to depart upward, so the presumptive sentence of eleven to thirteen months, as listed in the Journal Entry of Judgment and the corresponding statutory guideline box, was the maximum sentence he could have received. This burglary of a dwelling conviction satisfies the standard of "a crime punishable by imprisonment for a term exceeding one year," even under the *Plakio* and *Hill* standard.

Mr. Wattree had a criminal history classification of "I," and the offense severity level was 7. The corresponding box on the sentencing table grid shows an imprisonment range from eleven to thirteen months. *See* K.S.A. § 21-4704(a). The box also is located under the disposition line, indicating that there is a presumptive disposition of nonimprionment, or in other words, presumptive probation. *Id.* Mr. Wattree points to the fact that he was facing only "presumptive probation" to show he was not subject to a presumptive term of imprisonment exceeding one year. As discussed herein, however, the presumptive durational sentencing range and not the presumptive disposition is determinative of whether a crime is punishable by more than a year.

The sentence that a Kansas court can impose is determined by the sentencing table, in which "[s]entences expressed in such grid represent months of *imprisonment*." *See* K.S.A. § 21-4704. In *Plakio* the issue was whether the court could increase the base offense level under U.S.S.G. § 2K2.1(a)(4)(A) based on a prior state felony drug conviction when "the maximum punishment for the offense for someone with his criminal history category was eleven months under the state sentencing guidelines." *United States v. Plakio*, 433 F.3d 692, 693 (10th Cir. 2005) (sentencing took place at time when all upward departures were unconstitutional).[3] The court stated that "to determine the maximum possible sentence" under Kansas law, the court looks to "the crime of conviction and the offender's criminal history," and the "sentence contained in the grid box at the juncture of the severity level of the crime of conviction and the

[3] *See also Hill*, 512 F.3d at 1282, n.3 (*Plakio* is binding in section 922 case even though it is a sentencing guidelines case because it relied on precedent interpreting section 922, both of which contain identical language).

offender's criminal history category is the presumed sentence." *Id.* (quoting *State v. Gould*, 23 P.3d 801, 811 (2001)). The court determined that Plakio's offense "expos[ed] him to a presumptive sentencing range of nine to eleven months," and did not factor in or discuss whether there was presumptive probation or presumptive prison disposition.[4]

In *Hill* the Tenth Circuit faced a similar issue as in *Plakio*, but the inquiry was under 18 U.S.C. § 922 and the new sentencing scheme that allows for limited departures that comport with *Apprendi*. The defendant's "presumptive sentence range was nine to eleven months with a presumption of probation." *Hill*, 512 F.3d at 1278. The Tenth Circuit focused on the range of nine to eleven months, the presumptive durational sentencing range, and not the presumptive disposition of probation. "Because it is no longer possible for a defendant to be sentenced to a term greater than the presumptive sentence based on an aggravating factor unless that factor is found beyond a reasonable doubt by a jury, Hill's maximum sentence was eleven months. . . . 'In other words, the relevant 'statutory maximum' is . . . the maximum [the judge] may impose without any additional findings.'" *Id.* at 1282 (quoting *Blakely*, 542 U.S. at 303) (emphasis added).

The Tenth Circuit decisions that focus only on durational departures, as opposed to dispositional departures, are consistent with Kansas state case law. In Kansas, *Apprendi* protections are not given for dispositional departures. *State v. Carr*, 274 Kan. 442, 53 P.3d 843 (2002). In *Carr* the defendant entered a plea agreement in which the government agreed to recommend probation because the applicable box in the sentencing grid indicated probation was the presumptive disposition. *Id.* at 443. At sentencing, however, "the district judge immediately

[4] Plakio received an eleventh month suspended sentence and was placed on probation.

and without notice exercised the discretion granted him under the KSGA, refused to grant Carr probation, and imposed a prison sentence of 15 months." *Id.* at 444. Consequently, the Kansas Supreme Court was faced with the issue of "whether the United States Supreme Court intended *Apprendi* to apply to upward dispositional departures, i.e., imposing prison rather than granting probation or parole, under the KSGA." *Id.* The Court reasoned that "[p]robation and parole are dispositions alternate to the serving of a sentence, and neither probation nor parole increase or decrease the sentence required to be imposed by statute." *Id.* at 451. "We conclude that *Apprendi* applies only to upward *durational* departures of a sentence imposed under K.S.A.2001 Supp. 21-4716. The distinction between probation and the imposition of a prison sentence renders the United States Supreme Court's *Apprendi* decision inapplicable to a sentencing judge's decision to impose a dispositional departure prison sentence rather than to grant probation." *Id.* at 452 (emphasis added) (demonstrating that the pre-*Apprendi* departure standard, whether the judge's reasons were substantial and compelling, still applied to the review of a dispositional departure). Thus, a Kansas state court judge has always had discretion to depart on dispositional presumptions without first satisfying the *Apprendi* standards.

The focus under 18 U.S.C. § 922(g), then, is on the maximum durational sentence to which this defendant, Mr.Wattree, was exposed. The relevant determinative sentence comes from the sentencing table that states terms of *imprisonment*, and the question turns on whether that durational presumptive sentence is in excess of one year. The presumptive disposition of either prison or probation is not controlling because the court had discretion to depart from that presumptive disposition without first submitting facts to a jury; the disposition itself does not affect the maximum sentence exposure of a particular defendant. Thus, the maximum

punishment Mr. Wattree faced did include imprisonment, regardless of the presumptive disposition. As indicated on the Sentencing Guidelines Journal Entry of Judgment for the burglary conviction, Mr. Wattree was exposed to a maximum durational sentence of thirteen months' imprisonment, so he was convicted of "a crime punishable by imprisonment for a term exceeding one year."

**b. Aggravated Escape from Custody Conviction**

Mr. Wattree was sentenced on a conviction for aggravated escape from custody on May 23, 2001, again at a time when upward departure sentences were unconstitutional. Mr. Wattree argues that the maximum sentence he faced for this crime was less than a year, so it is insufficient to base the felon in possession charge on this conviction. The Journal Entry of Judgment shows a criminal history category of "I," and the offense severity level of 8. The corresponding sentencing range is seven to nine months' imprisonment, with a presumptive disposition of probation. As noted under the burglary conviction, the presumptive disposition of probation is not dispositive of whether someone was convicted of a crime punishable by imprisonment for a term exceeding one year. The Court, then, analyzes the seven to nine months' imprisonment range to determine if this is a qualifying conviction under 18 U.S.C. § 922(g)(1).

The government's main argument as to this conviction is that the Journal Entry of Judgment shows the incorrect sentencing range, so contrary to that document, Mr. Wattree was actually exposed to a sentencing range that included a time period greater than a year. In other words, the government assumed that because Mr. Wattree had a previous burglary conviction, the state judge miscalculated Mr. Wattree's criminal history category, which resulted in an

incorrect showing of his maximum sentence exposure.[5] The government provides no evidence other than pointing to that prior burglary conviction to show that the Journal Entry of Judgment was written erroneously by not including the burglary conviction to increase the level of his criminal history.[6]

The government's assumption is incorrect. There is a very plausible reason why the state judge calculated the criminal history category at the lowest level possible, and why there were no objections to such a calculation. Section 21-4710(d)(11), Kansas Statutes Annotated, states, "[p]rior convictions of any crime shall not be counted in determining the criminal history category if they . . . are elements of the present crime of conviction." As described in *State v. Perez*, 80 P.3d 361 (Kan. 2003), aggravated escape from custody, K.S.A. § 21-3810, requires a defendant to be in lawful custody *upon a charge or conviction of a felony*. *Id.* at 362-65 (discussing *State v. Taylor*, 939 P.2d 904 (Kan. 1997), which held that the prior conviction is an element of aggravated escape of custody and cannot be used to enhance the criminal history category). Under K.S.A. § 21-4710, when the crime for which the defendant is already in custody is an element of the aggravated escape from custody conviction, it may not be used to enhance a defendant's criminal history category when sentenced for the aggravated escape. As applied to this case, the state court judge could not use the burglary conviction for which Mr.

---

[5] The government also references that on that same Journal Entry, the statute cited does not correspond with the offense. It does appear that the wrong statutory number was written, but aggravated escape from custody was still listed as the crime committed. The Court does not find that this is dispositive as to any issue before this Court.

[6] Because the government provides no outside evidence and its argument fails anyway, the Court does not address whether it is bound by the state's documents to determine a defendant's maximum sentence.

Wattree was in custody to enhance his criminal history category in determining the maximum sentence for Mr. Wattree's conviction for aggravated escape from custody.

In light of the Tenth Circuit precedent and Kansas state law discussed in the preceding subsection, this Court accepts that the maximum sentencing range to which Mr. Wattree was exposed was seven to nine months, as indicated by the state court on the Journal Entry of Judgment. *See generally United States v. Svacina*, 1996 WL 63354 (D. Kan. Sept. 17, 1996) (finding that journal entry of judgment was most reliable evidence to show what conviction and sentence were, indicating that the challenging party presented nothing to show that the entry was made in error). Thus, as indicated by that Journal Entry, which is consistent with the statutory sentencing grid at K.S.A. § 21-4704, Mr. Wattree was exposed to a maximum possible sentence of nine months on the aggravated escape from custody conviction. Obviously, then, as to Mr. Wattree, this was not a crime punishable by more than one year imprisonment. This conviction, therefore, cannot be a basis for a conviction under 18 U.S.C. § 922(g)(1), which makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term *exceeding one year*."

**3. Conclusion on Motion to Dismiss**

Because the burglary conviction provides a basis for charging Mr. Wattree under section 922(g)(1), the Court DENIES in part the motion to dismiss Count One that basis. The government may continue to rely on that underlying burglary conviction. However, because a conviction on Count One cannot stand on the basis of the aggravated escape conviction, the Court GRANTS in part the motion to dismiss on that basis. The government may not rely on the 2001 Aggravated Escape from Custody conviction, case number 00CR3166 for Count One.

## MOTION TO DETERMINE ADMISSIBILITY OF CUSTODIAL STATEMENTS

### 1. Waiver of rights

The government made a sufficient showing that Detective Sutton clearly and unequivocally advised Mr. Wattree of his Miranda rights. Detective Sutton read these rights to him from a standard form listing those rights, thereby satisfying the duty to fully advise the accused of his Fifth Amendment rights before beginning the custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

The government then bears the burden to prove by a preponderance of the evidence that Mr. Wattree waived these rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997). A defendant must voluntarily, knowingly, and intelligently waive his rights for the waiver to be valid. *Miranda*, 384 U.S. at 444. To qualify as voluntary, the waiver must be a result of free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Connelly*, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause.").

The government proved that Detective Sutton did not use any coercive or deceptive tactics but instead was straightforward and forthcoming when he advised Mr. Wattree of the matter being investigated, advised him of his rights, and asked him if he was wiling to speak to him. Mr. Wattree orally agreed to talk to Detective Sutton, even though he refused to sign the Miranda waiver form. The court finds his refusal to sign the advice of rights form did not override Mr. Wattree's oral consent to waive his rights. *United States v. Yazzie*, 188 F.3d 1178

(10th Cir. 1999) ("His refusal to sign the advice of rights form was clearly overridden by Mr. Jones' verbal indication he understood his rights and was willing to talk."); *United States v. McKinney*, 758 F.2d 1036, 1045 (5th Cir. 1985) (rejecting the defendant's "claim that his refusal to sign a waiver form automatically rendered further questioning illegal" and agreeing with the district court's implicit determination that the defendant "voluntarily waived his Miranda rights, notwithstanding his failure to sign the form."); *United States v. Zamarripa*, 544 F.2d 978 (8th Cir. 1976) ("A voluntary waiver need not assume any particular form; it may be made in writing on a printed format or it may be made orally. . . When the circumstances indicate that a defendant knew of his right to remain silent and to have counsel, yet intelligently waived that right by voluntarily answering questions, his refusal to sign a written waiver does not render a confession or an incriminating statement inadmissible."). At the only time that Mr. Wattree stated that he no longer wanted to talk (i.e., that he wanted to remain silent), the detective ended the contact. The waiver of the rights was voluntary, and once the right to remain silent was invoked, the Detective ceased communication and did not violate Mr. Wattree's rights.

That does not end the inquiry. Additionally, the Court must determine whether the waiver was knowingly and intelligently given. "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a 'requisite level of comprehension.' A waiver is knowing and intelligent only if it was made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' A defendant need not, however, understand all the consequences of the waiver. He need only understand his right to remain silent or have his statements used against him." *United States v. Minard*, 208 Fed. Appx. 657, 660, 2006 WL 3598396, *3 (10th Cir. Dec. 12, 2006) (quoting *Moran*, 475 U.S. at

421); *see also United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (to determine whether a waiver was intelligent, the court should "inquire whether the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him. . . A suspect need not, however, understand the tactical advantage of remaining silent in order to effectuate a valid waiver.").

Detective Sutton stated that he put a line next to each paragraph on the advice of rights form after he asked the defendant if he understood the rights. He never stated whether Mr. Wattree responded as to whether he did or did not understand those rights. Despite this, the Court finds that based on the totality of the circumstances, Mr. Wattree's voluntary waiver was made with the "requisite level of comprehension," or in other words, it was made knowingly and intelligently.

First, Mr. Wattree knew what rights he was waving, as Detective Sutton expressly informed him of the specific rights by reading the form, including the right to remain silent and that the statements could be used against him. Detective Sutton also informed Mr. Wattree of the nature of the criminal investigation. Detective Sutton indicated that the lines marked on the advice of rights form were used as an indication that they had gone over that specific paragraph. It was a way for him to keep track of whether he needed to come back to it. As all the rights were marked, it is apparent that Detective Bundy did not need to go back over them with Mr. Wattree. Even more convincing is that Mr. Wattree stated that he was a high school graduate, that he was taking classes at the community college, and that he was smarter than the average guy. He also read the waiver of rights to Detective Sutton, indicating a sufficient level of literacy. Furthermore, Mr. Wattree's invocation of his right to remain silent, after a short

conversation with Detective Sutton, further bolsters that he understood he had the right to do so. The Court concludes that Mr. Wattree had the requisite level of comprehension and made a knowing and intelligent waiver of his rights. The confessions and/or incriminating statements are admissible.

**2. Voluntariness of Statements**

In addition to the challenges based on *Miranda*, Mr. Wattree also challenges the admissibility of the statements based upon the Due Process Clause. "Our Supreme Court has recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. The due-process inquiry examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *United States v. Nelson*, 450 F.3d 1201, 1210 (10th Cir. 2006). Not only must the waiver of rights be voluntary, but the statements must also be freely made. "[T]he Supreme Court has looked at a number of factors, including the age, education, and intelligence of the suspect, the length of his detention and the questioning, and the use of physical punishment." *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987). The court has considered the due process claim raised by Mr. Wattree, and given its findings in connection with the waiver of his rights regarding these factors, the Court finds the statements were voluntarily made and that Mr. Wattree's will was not overborne. The use of his statements at trial will not offend his due process rights.

**IT IS HEREBY ORDERED** that the Motion to Dismiss Count One (doc. # 15) is GRANTED IN PART to the extent that the aggravated escape conviction may not be utilitzed but DENIED IN PART as to the burglary conviction as discussed herein. The Motion to Suppress (doc. # 16) is DENIED. In response to the Motion to Determine the Admissibility of Custodial Statements (doc. # 17), the Court finds that the custodial statements by Mr. Wattree are admissible.

**IT IS SO ORDERED.**

Dated this 11th day of April, 2008.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge